# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 26, 2016 Session

## STATE OF TENNESSEE v. JEFFREY SCOTT LONG

### Appeal from the Circuit Court for Blount County
### No. C18506  David Reed Duggan, Judge

### No. E2015-01287-CCA-R3-CD

FILED

JUL 1 1 2017

Clerk of the Court
Rec'd by_____

Defendant, Jeffrey Scott Long, was indicted by the Blount County Grand Jury for first degree murder, felony murder during the perpetration of a burglary, aggravated burglary, and aggravated assault.  Following a jury trial, Defendant was convicted as charged, and the trial court merged the two murder convictions.  The trial court imposed a life sentence for the murder conviction and concurrent six-year sentences for the remaining two convictions.  In this appeal as of right, Defendant raises the following issues for our review: 1) Defendant's statement to police should have been suppressed because he made an unequivocal request for counsel, and he did not knowingly and voluntarily waive his *Miranda* rights; 2) the trial court erred by admitting into evidence an order of protection granted to the victim against Defendant; 3) the trial court erred by admitting into evidence autopsy photos; 4) the trial court should have suppressed evidence seized as a result of a warrantless search of Defendant's apartment; 5) the trial court erred by allowing expert testimony outside the scope of the forensic pathologist's expertise; 6) the trial court erred by denying Defendant's request for a special jury instruction; 7) the trial court erred by allowing evidence that was not properly authenticated; 8) Defendant was denied a fair trial because a portion of trial testimony was not transcribed; 9) the evidence was insufficient to sustain Defendant's convictions; 10) the State exceeded the scope of its closing argument on rebuttal; and 11) the cumulative effect of the errors requires reversal of Defendant's convictions.  Having carefully reviewed the entire record and briefs of the parties, we conclude that there is no error.  Accordingly, we affirm Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and ROBERT H. MONTGOMERY, JR., JJ., joined.

George R. Maifair, Nashville, Tennessee, for the appellant, Jeffrey Scott Long.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Betsy Smith and Shari Tayloe, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Pretrial motions*

*July 15, 2010 hearing on motion to suppress Defendant's statement*

Detective Kris Sanders, of the Alcoa Police Department, was the lead investigator in the September 10, 2009 death of the victim, Janice Long. On September 12, 2009, Detective Sanders interviewed Defendant at the Alcoa Police Department. Defendant's handcuffs were removed, and he was given a soda to drink. A video recording was made of the interview. Detective Sanders reviewed a *Miranda* rights waiver form with Defendant, and Defendant signed it. Before signing the waiver, Defendant stated, "I am gonna have to get an attorney, but I mean I was gonna talk to y'all without one for a little bit here. So, I still have to sign this even though I'm gonna get an attorney?" In response, Detective Sanders stated, "If you are requesting an attorney then I have to stop right now, and that's what you're doing." Defendant stated, Well I'm gonna have to have an attorney in court." Detective Susan Burcham, who was also in the interview room, stated, "Well, this isn't regarding court . . . ." Defendant interrupted, stating, "I know. Y'all are wanting a statement on what happened. I know exactly what y'all are wanting. Y'all want to know my side of the story cause there's not a story until I tell y'all something." Defendant continued, "What I was reading right here, I mean, it says up here that I can stop answering questions at any time. . . . So, I can still sign this and if I want to answer a question I can, and if I don't, I don't have to. I mean, I basically wanted to tell y'all what happened. I mean, I don't mind doing that."

Detective Sanders then gave the following explanation:

> Let me explain it to you this way. You have two rights, ok. One of those rights is the right to remain silent, not to tell us anything, ok. You also have the right to have an attorney present, ok. Those two rights can be invoked at any time during this process. What you're doing by signing this waiver is you are waiving those rights, and you're agreeing to talk to us. But what you've got to remember is if we ask you a question you don't want to answer, you don't have to answer, ok. If we start getting in our discussion to where you are feeling uncomfortable, you can stop this interview at any time, ok. You can request an attorney at any time. Now once you request the attorney or tell us you don't want

2

to answer a question, then we are done. You can invoke your rights at any time.

Defendant responded, "From what I understand they're not gonna give me an attorney until I go to court anyway." Detective Sanders responded, "That's true." Detective Burcham added, "Right, that doesn't mean [an attorney] is gonna appear, here now." Defendant then stated, "I don't mind signing [the waiver]. I mean, I wanna talk to y'all a little bit anyway. I been [sic] wanting to." Detective Sanders stated,

Before you start, I want to make sure you understand that you can at any point during this invoke your rights and we will stop, ok. So you understood everything I read to you? And you understand that you have the power to say, I'm done talking, I would like to get an attorney? And you understand that? Is there any question you have about that?

Defendant indicated that he understood and had no questions.

The trial court denied Defendant's motion and concluded,

There is no question, absolutely none, that [Defendant] was fully advised of his right to have an attorney for advice before we ask you any questions and to have an attorney with you during questioning. That was clearly read to him. We not only heard it, it's in the *Miranda* form that we have here today. I'll come back to when it was signed here in a moment. So, there is no question that he was told. Absolutely no question that he was told he had the right to have the attorney – to talk to an attorney before he was asked any questions and to have the attorney present during questioning.

. . . .

The only thing that even gives me pause in this case is because at one point [Defendant] said, from what I understand they're not going to give me an attorney until I go to court anyway and Detective Sanders said that's true. Obviously the Defendant could say, well, I was given bad advice at that point. And in essence that's what you are. I was given bad advice, because that says I can't have a lawyer until I get to court. If that were all that was said I would rule in the Defendant's favor. If that were all that was said and then the questioning proceeded, I would rule in the Defendant's favor. But that's not all that was said. It

3

did not stop there. . . . I counted nine times where the Detective said to the effect of you can invoke your rights any time.

The trial court concluded, "looking at the totality of the circumstances and what was said after that, I think it was made very clear to [Defendant] that he did not have to talk to these detectives. He could have stopped at any time and had an attorney appointed.

*May 16, 2012, hearing regarding warrantless search of Defendant's apartment and admissibility of autopsy photographs and crime scene video*

Rusty Aycocke, Assistant Commander of the Blount County Sheriff's Office SWAT team, testified that he responded to the Shamrock Motel on September 11, 2009, at approximately 3:00 a.m. The SWAT team began to evacuate apartments that were not "the target location." As the SWAT team waited outside the apartment, Defendant opened the door "on his own free will" and without request. Deputy Aycocke saw Defendant sitting in a chair just inside the doorway. Defendant appeared to be covered in blood and had a "serious wound on his left arm." Defendant was "in distress" and in need of medical attention. Deputy Aycocke and others entered the apartment "to render aid." The police found a framed photograph of the victim and an apparent suicide note in Defendant's lap.

Detective Sanders testified that he responded to a homicide call at Cerritos Way apartments. The maintenance man for the apartments, James Ezell, had reported that he saw Defendant walking towards the apartments. Mr. Ezell knew that the victim had obtained an order of protection against Defendant. He contacted the apartment owner, who then requested a welfare check on the victim. Responding officers entered the victim's apartment using a key provided by Mr. Ezell's girlfriend. A table had been pushed against the door. Officers found the deceased victim inside the apartment. Detective Sanders testified that the victim was lying on her back between the refrigerator and the stove. Detective Sanders testified that "[a] lot of blood spatter was in the area where the victim's body was." It was "obvious to [him] that a struggle had taken place." The window in the back bedroom was open, and there were "reddish-brown stains" on the window, and it appeared as though "someone had left in a hurry through that window." Detective Sanders observed several items in disarray, and the refrigerator appeared to have been pushed out of place.

The police located Defendant's vehicle in the parking lot of the Shamrock Motel. Police entered Defendant's room at approximately 3:48 a.m. Defendant was transported to Blount Memorial Hospital and admitted at 4:07 a.m. Defendant was discharged from the hospital at 4:02 p.m. and transported to the local jail. Detective Sanders testified that

4

Defendant was arrested without a warrant because, "I knew a crime had been committed and . . . I had reasonable cause to believe that [Defendant] committed that crime[.]"

On September 11, 2009, Detective Sanders executed a search warrant for Defendant's apartment. On the following day, he executed a search warrant for Defendant's van. Detective Sanders began his interview with Defendant at approximately 7:19 p.m. on September 12, 2009. Defendant was 47-years-old at the time of the interview. Detective Sanders testified that the interview lasted approximately four hours. Defendant did not appear to be intoxicated. Defendant was transported back to the jail from the police department at approximately 11:34 p.m. Detective Sanders testified that Defendant told him at the beginning of the interview "that he thought we would have come to get him sooner, that he was wanting to talk to us."

After the interview, Detective Sanders prepared warrants charging Defendant with homicide and burglary. He took the warrants to the magistrate at approximately 2:00 a.m. on September 13, 2009. Defendant appeared before the magistrate at approximately 3:15 a.m., approximately 48 hours after his arrest.

On redirect examination, Detective Sanders testified that when he entered the victim's apartment, his "immediate attention and focus was to the interior of the apartment, where the victim's body was and everything inside that scene." He testified that he "walked to the rear of the apartment, [but he] did not search that area." He testified that he "walked back there to visually observe what was there."

Detective David Henderson, of the Blount County Sheriff's Office, testified that when police entered Defendant's apartment, he saw "a major amount of blood around the apartment, on the Defendant. [He] [h]ad a major laceration to his arm and, plus, very groggy, out of it." Detective Henderson testified that he did not search the apartment, and the only purpose for entering the apartment was "[t]o take pictures of – the investigation of attempted suicide, of blood. Investigation process."

The trial court denied Defendant's motion to suppress the warrantless search of Defendant's apartment. The trial court accredited the testimony of "both officers" Aycocke and Sanders. The trial court found that Defendant" opened the door of his own free will, . . . [and] it was apparent that he was in distress, that there was blood and a serious wound, that he needed medical attention[.]" The court concluded as follows:

> [T]here were clearly exigent circumstances in the serious wound to the
> Defendant, which justified the officers' entry for the limited purpose of
> securing the scene and rendering aid to the Defendant, and securing and
> making the scene safe for the emergency medical personnel, and

5

preserving photographic evidence of the attempted suicide, such exigent circumstances and indeed even a duty to enter and render aid.

Dr. Darinka Mileusnic-Polchan, a forensic pathologist, performed an autopsy of the victim on September 11, 2009. She determined that the cause of death was "isolated multiple stab and incised wounds, which is in the category of sharp force trauma." She also listed "blunt force injuries and strangulation" as contributing causes. Dr. Mileusnic-Polchan noted "fine petechiae" in the eyes and lips, bruising of the neck muscles, and a fracture of the hyoid bone, which all indicate strangulation. She noted facial bruises and lacerations on the victim's head, which indicate blunt force trauma. Dr. Mileusnic-Polchan testified that the shape and pattern of the victim's injuries were consistent with a hammer found beside the victim's body. She photographed blunt and sharp force injuries to the victim's head that were consistent with the hammer and claw end of the hammer. She described the blunt force injuries on the victim's hands as "defense injuries." Dr. Mileusnic-Polchan believed that the photographs of the victim's injuries would be helpful to a jury's understanding of her testimony. She testified:

> I would say yes, because it's a very complex case. It has a combination of different types of injuries. And in any forensic pathology involvement, the photographs are evidence and the – of course, for the jury we have to kind of keep a good balance between what's acceptable to them and what is not. But as a pathologist, I would have a hard time describing the different types of injuries, comparing the pattern with the weapon just by describing them. And I don't think just my description and talking would give them an accurate photograph – or mental image, so to speak, of the complexity of the case.

The trial court weighed the probative value against the prejudicial effect of each autopsy photograph and concluded that certain photographs would be allowed into evidence because they would assist the jury in understanding testimony about the victim's injuries. Specifically, the trial court allowed the following photos: 1) a photo of the victim's eye, which showed petechiae as evidence of strangulation; 2) a photo of the extracted neck organs to show hemorrhaging, bruising, and fracturing in those areas; 3) a photo of the face and neck to show the various traumas to those areas; 4) photos of the left side of the victim's face and the victim's forehead to show the pattern and shape of the injuries; 5) a photo of a large laceration on the right side of the victim's skull and two close-up photographs of the back of the victim's head as evidence of multiple blows and to show patterned injury; 6) photos of the defensive wounds on the victim's right and left hands; 7) a photo of an incised wound on the right side of the victim's neck; 8) a photo of the victim's back and head to show the variety of trauma to those areas; 9) a photo of the body as it was found at the crime scene to show evidence of a struggle; and 10) a closer

6

photo of the body at the crime scene to show blood flow and to aid the jury in understanding testimony about the victim's movements. The court ordered the State to crop or redact facial and vaginal portions of the photo showing the defensive injuries on the victim's right hand. The court excluded certain photos that the court found were "gruesome" or unnecessary to explain testimony, and of which the court found the prejudicial effect outweighed the probative value. Finally, the court allowed a video of the crime scene to show the size of the victim's apartment, but the court ordered the State to redact any portions of the video that show the victim's face and body close-up.

*June 12, 2012 hearing regarding admissibility of order of protection*

Dorothy McClure, Chief Deputy Clerk in Blount County, testified that she typed an order of protection for the victim in 2009. She testified that the victim was "[e]xcited, nervous, [and] scared." She testified that the victim gave her a handwritten statement that Ms. McClure used to type the order of protection. The victim wrote at the end of her statement, "Help me!!!"

The trial court made the following findings and conclusions:

With respect to the 2009 order of protection, the Court notes first, as the State has argued, that the order of protection itself – and then I'm going to come back to, in a few minutes, the statement within the order of protection – is relevant and that they need to use it to carry their burden of proof because there is a fourth count in this criminal proceeding of aggravated assault, alleging that the Defendant committed bodily injury after a prior restraint by, in this case, an order of protection. So, in part, the order of protection is necessary just for the State to be able to carry its burden of proof with respect to Count 4.

I also think it's relevant with respect to Count 3, aggravated burglary. Because I think the fact that there's an order of protection saying that there was to be no contact is relevant to the issue of whether the Defendant entered the habitation without consent. So, I think it's relevant also to the third count.

Now, in addition, the Court finds that at issue in this first-degree murder case – and here we have alternative theories – first[-]degree murder and first-degree murder based upon felony murder. Motive is at issue; intent is at issue; premeditation is at issue. And I find that the order of protection is relevant to the relationship between the parties at the time of this alleged crime. I think it's also relevant to motive. I

think it's relative to intent. I think it's relevant to the issue of premeditation. And I think it's relevant to the complete picture of the events that transpired.

So, I think based upon that, that there are material issues that exist other than conduct conforming with a character trait for the use of the order of protection. And I find that the order of protection is clear and convincing evidence related to those various issues.

And I also find for all of the reasons I've stated, including the fact just very simply that any prejudicial effect of the proof is outweighed by the probative value of the evidence and is necessary to support the State's burden of proof.

The trial court ordered the redaction of certain statements in the order of protection. However, the trial court found that the probative value of the statements contained in the order of protection outweighed their prejudicial effect.

*August 16, 2012, hearing regarding admissibility of evidence pursuant to inevitable discovery doctrine*

Teeann Guy, the rental agent for Defendant's apartment, testified that she reviewed a rental application with Defendant before his tenancy. She testified that rentals at the Shamrock Motel were "by the week" and subject to a two-day eviction procedure. Defendant completed a rental application on August 28, 2009. Ms. Guy testified that she spoke to Defendant on the night of the incident. Defendant told Ms. Guy that he did not have his rental payment, but that he would pay on the following morning. Ms. Guy never received payment. Defendant was evicted after his arrest. Ms. Guy was responsible for cleaning apartments after they were vacated. She testified that she found a knife with blood on it under the mattress in Defendant's former apartment, and she called Detective Sanders. She called Detective Sanders again when she found drug paraphernalia in Defendant's former apartment.

Defendant testified that he did not invite police into his apartment at the Shamrock Motel. Defendant testified that he had allowed a person named Jessica Dunbar to borrow his van before the incident. He testified that he did not give permission to police to search his van.

The trial court denied Defendant's motion to suppress items recovered from his apartment. Although the trial court found that the search warrants obtained in this case were invalid, the trial court stated, "[t]here is not a doubt in my mind that the evidence

8

that was seized at the apartment would have been discovered based upon the evidentiary hearing that we've conducted here today and what I've heard." The court found Ms. Guy to be "a very credible witness." The court found,

> I think clearly had she found these handwritten notes and a picture of the victim taken from a couch in the apartment, had she found a bag containing clothing with what appeared to be blood on it, a picture of the victim on the bed, a black purse in the closet, a knife on the dresser, I don't think there's any question that she would have called the police and that they would have found these items pursuant to the very fact that she did call the police with respect to other items.

## Facts presented at trial

At trial, a certified copy of the August 10, 2009 order of protection obtained by the victim against Defendant was admitted into evidence through the testimony of Chief Deputy Clerk Dorothy McClure. The petition for order of protection stated in part: "In 2009 [Defendant] hit [the victim] and toled [sic] her he would kill her and put her somewhere no one would find her. [Defendant] told her not be take an order of protection out on him, or she'd be sorry. Help me!!!" The victim was granted an ex parte order of protection prohibiting Defendant from contacting the victim and inflicting physical injury on her.

Ms. McClure testified that, while at the clerk's office, the victim "was sitting against the wall, hiding." She testified that the victim "was afraid that somebody would come by and see her in there." Ms. McClure described the victim as "scared, nervous, [and] anxious."

Patricia Lee Smith Myers worked with the victim at Rockford Manufacturing. She testified that when the victim spoke to her about Defendant, "[s]he'd be shaking and about in tears and she was scared. You could tell she was scared."

Donette Morgan owned the apartment complex where the victim and Defendant rented an apartment in "Building Two." Ms. Morgan evicted them for failing to pay rent. She subsequently allowed the victim to rent a different apartment in "Building One." Ms. Morgan testified that the victim did not want Defendant to know that she was living there, and she "acted nervous and worried." Ms. Morgan was aware that the victim had an order of protection against Defendant, and she instructed her employees to call 911 if they saw Defendant on the property.

James Eisele was the maintenance man at the apartment complex where the victim lived. On the night of September 10, 2009, Mr. Eisele saw Defendant at the complex. Defendant was walking towards the grass. Mr. Eisele called Ms. Morgan and told her that he had seen Defendant because Mr. Eisele knew that Defendant "wasn't supposed to be there." Mr. Eisele testified that he saw Defendant's van parked at Rose's Piano Shop, a short distance from the entrance to the apartment complex. A security video, showing images of Defendant at the apartment complex that night, was admitted into evidence. Defendant was carrying "a bag of some kind in his hand."

Steven Anderson, a patrol sergeant with the Alcoa Police Department, responded to a call for a "welfare check" at the victim's apartment at 10:20 p.m. on September 10, 2009. Officer Anderson knocked on the victim's door, and there was no response. He obtained a key to the victim's apartment from Mr. Eisele's girlfriend, Elizabeth Casper. The apartment door was obstructed by a table, and "[they] had to force the kitchen table back to get the door open." Officer Anderson found the victim's body on the kitchen floor, and there was "[a] lot of blood" around the victim. In the back bedroom, Officer Anderson observed an open window and blood on the windowsill and window blinds. Officer Anderson "had to step over [the victim's body] to finish clearing [the apartment]." Officer Anderson found a hammer on the floor in front of the refrigerator, and he moved it to the couch because he "was concerned about [paramedics] coming in [and] stepping on the hammer." Officer Anderson testified, "I figured it was going to be a piece of evidence that was used in the crime." Officer Anderson also observed a flashlight on the floor beside the victim's foot. Officer Anderson testified that the claw end of the hammer appeared to have blood on it, and the injuries to the victim's face appeared to have been caused by a sharp object. Police also found a chisel outside the bedroom window of the victim's apartment.

Lieutenant Paul Gilbert, of the Alcoa Police Department, was also dispatched to the area of the victim's apartment. He responded to the parking lot at Rose's Piano Shop, where Defendant's van was parked. The vehicle was registered to the victim. Lieutenant Gilbert then responded to the victim's apartment and made entry with Officer Anderson. Officer Hank Morris also assisted in making entry into the victim's apartment. A video of the crime scene was admitted into evidence through Officer Morris's testimony.

Deputy Clyde Ingle, of the Blount County Sheriff's Office, arrived at the Shamrock Motel in response to a "BOLO" for Defendant's van at approximately 1:30 a.m. on September 11, 2009. When Deputy Ingle drove up, he saw "a male subject[,]" who "took off running" into an apartment. Deputy Ingle found Defendant's van parked beside a dumpster at the apartment complex. He confirmed that the vehicle was the same vehicle in the BOLO. Deputy Ingle secured the premises until the SWAT team arrived at the scene.

10

Rusty Aycocke, the Assistant Commander of the Blount County SWAT team, arrived at the Shamrock Motel at 2:40 a.m. on September 11, 2009. The SWAT team secured the perimeter of the scene and evacuated the apartments in the same building as Defendant's apartment building. While the SWAT team waited outside Defendant's apartment, "[t]he door to the apartment . . . opened up wide and [Defendant] himself opened the door." After the door opened, Aycocke saw Defendant sitting in a recliner chair inside the doorway, and he had blood on his arm, shirt, and pants. Aycocke testified that "it was clear that [Defendant] . . . was in distress and in need of medical attention." The SWAT team entered the apartment "to render aid to him and to check the apartment to make sure the apartment was safe for EMS to come and give care to [Defendant]."

SWAT team member Matthew Gilmore testified that Defendant "had a severe wound to his left harm, he had blood all over." Police found a photograph of the victim and a handwritten note in Defendant's lap. The note read, "I loved Jan I could not live without her I'm sorry I did not deserve the order of protection." The second page of the note read, "I took 25 hydros to overdose. We both can see the end from here. She will go to heaven, I will go to hell. I love my mom. You should not let [sic] the order of protection when I did nothing wrong. It's not fair to keep someone away." Police later collected the following items from Defendant's apartment: a t-shirt, blue jean shorts, and a purse containing a cell phone, wallet, paycheck made out to the victim, and the victim's driver's license.

Felicia Smith, the payroll manager at Rockford Manufacturing Company, presented copies of checks paid to the victim between July 30, 2009 and September 3, 2009. A check dated September 10, 2009, payable to the victim, was not cashed.

Tennessee Bureau of Investigation ("TBI") Agent Bradley Everett testified as an expert in the field of serology and DNA analysis. He testified that the t-shirt and jean shorts collected from Defendant's apartment tested positive for the victim's blood. The hammer found inside the victim's apartment and the chisel found outside the apartment window also tested positive for the victim's blood. Blood samples collected from the refrigerator and bedroom window sill in the victim's apartment also matched the victim's DNA profile. Agent Everett tested the handle of the chisel for "touch DNA" and found that human DNA was present, but the sample was insufficient to obtain a DNA profile. A touch DNA analysis of the hammer handle revealed DNA that matched the victim's profile.

Dr. Darinka Mileusnic-Polchan, performed an autopsy on the victim. Detective Sanders was present during the autopsy. Dr. Mileusnic-Polchan determined that the

11

cause of the victim's death was "multiple stab and incise wound[s], which is sharp force trauma." The victim also had multiple blunt force injuries to the head and strangulation, which she testified "were considered significant conditions contributing to her death." Dr. Mileusnic-Polchan found 41 blunt force injuries and 14 sharp force injuries, including defensive injuries on the hands, wrists, and forearms. The victim was five feet and two inches in height and weighed 115 pounds. Dr. Mileusnic-Polchan testified that many of the blunt force injuries on the victim's head were of a shape and pattern consistent with the hammer found near the victim's body. The victim also had laceration injuries to the scalp that were consistent with the claw part of the hammer. A stab wound on the victim's neck caused the carotid artery to be severed. Dr. Mileusnic-Polchan opined that this injury was the primary source of blood at the crime scene. She also testified that some of the stab wounds on the victim's neck could have been caused by the chisel found outside the victim's bedroom window. Based on the blood evidence, she determined that "the [victim's] body never leaves this corner[.]"

Detective Kris Sanders testified. He described the scene at the victim's apartment as he observed it. Detective Sanders' video recorded interview with Defendant was played for the jury.

During the interview, Defendant told Detective Sanders that he had seen the victim "with a guy in the car with her" twice in the previous week. He stated that he was "pissed off" because the victim had obtained an order of protection against him. He knew that he was not supposed to "go around" the victim. He stated that he went to the victim's apartment around 10:00 p.m. "to see if a guy was there." He thought that the victim was not at home. He stated that the door was unlocked, and he went inside the apartment to see if he could tell if another man was living with the victim. The victim arrived home, and "that's when it all started." Defendant stated that he "basically just wanted to leave. [He] didn't really want any trouble." Defendant stated that the victim had a pocket knife and she told him, "'you know, I can kill you, and there ain't [sic] a damn thing you could do about it.'" Defendant stated that the victim chased him into the bedroom, and he grabbed a hammer and turned around and "hit her in the head with it." Defendant showed Detective Sanders injuries on his leg and said, "I mean, you can pretty much see, it was a pretty good scuffle." Defendant stated that he "wasn't trying to kill her." He thought if he "knocked her out," he could leave the apartment. Defendant estimated that he hit the victim with the hammer three or four times.

Defendant heard a knock on the victim's door, and he "figured it was the police department." Defendant "got the knife away from [the victim]." According to Defendant, the victim reached for the hammer and tried to yell, and Defendant stabbed her in the neck with the knife. Defendant then left the victim's apartment through the bedroom window. He stated that he grabbed the victim's purse on his way out in case he

12

needed to break the window to exit. Defendant stated that he took "a knife" with him because he did not know if the victim was going to follow him and try to stab him. He stated that when he left the apartment, the victim was "very alive."

Defendant testified that when he arrived at his apartment, he "was scared" and "afraid something was going to happen to [the victim], which [he] was pretty much sure it was." He stated, "I mean, we had a hell of a fight. . . ." Defendant stated that he was "paranoid as hell."

Defendant stated that he believed his and the victim's relationship deteriorated over financial problems. "I believe when the money started going downhill, then she started looking for somebody that had some money."

### Analysis

#### Suppression of Defendant's statement

Defendant contends that his statement should have been suppressed because it was made after an unequivocal request for counsel. Defendant also asserts that he was not adequately advised of his *Miranda* rights and that he did not knowingly and intelligently waive his rights. The State responds that Defendant's waiver of his rights was knowing and voluntary, and his request for counsel was equivocal.

On appeal from a trial court's ruling on a motion to suppress, the trial court's findings of fact should be upheld unless the evidence preponderates to the contrary. *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009). The credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, when the trial court's findings of fact at a suppression hearing are based solely on evidence not requiring credibility determinations, "the rationale underlying a more deferential standard of review is not implicated." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). Such findings of fact are reviewed de novo. *State v. Payne*, 149 S.W.3d 20, 25 (Tenn. 2004).

Whether an individual's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review. *State v. Turner*, 305 S.W.3d 508, 514 (Tenn. 2010). Our review of the question in this appeal is entirely de novo, with no deference to the trial court's factual findings, because the trial court's factual determinations were based upon the video recording of Defendant's interrogation, which is included in the record on appeal. *See Turner*, 305 S.W.3d at 514 (applying de novo review because the trial court's determination was based on video evidence

13

included in the appellate record). Finally, a conviction may be affirmed, notwithstanding a nonstructural constitutional error, if the State proves beyond a reasonable doubt that the error "did not contribute to the verdict obtained." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (internal quotation marks omitted).

The video recording of Detective Sanders' interview of Defendant shows Detective Sanders read Defendant his *Miranda* rights. Detective Sanders asked Defendant if he had any question about any of his rights, and the following exchange occurred:

> Defendant: I'm going to have to get an attorney, but I mean, I was going to talk to you all without one for a little bit here. So, I still have to sign this even though I'm going to get an attorney?
>
> Detective Sanders: If you're requesting an attorney, then I have to stop right now. And that's what you're doing.
>
> Defendant: Well, I mean, I'm going to have to have an attorney in court.
>
> Detective Burcham: Well, this isn't regarding court - -
>
> Defendant: I know y'all are wanting a statement on what happened. I know exactly what y'all want. Y'all are wanting to know my side of the story, because there's not a story until I tell y'all something.
>
> Detective Burcham: But if you're requesting an attorney in order to get that side of the story - -
>
> Defendant: Well, what I was reading right here, it says up here that I can stop answering questions at any time. But I have to still sign this if I want to answer questions I can [and] if I don't, I don't have to.
>
> Detective Burcham: Correct.
>
> Defendant: I basically wanted to tell y'all what happened. I mean, I don't mind doing that.

Detective Sanders then explained to Defendant that he had the right to remain silent and the right to have an attorney present and that "those two rights can be invoked at any time during this process." Detective Sanders explained:

14

Let me explain it to you this way. You have two rights, ok. One of those rights is the right to remain silent, not to tell us anything, ok. You also have the right to have an attorney present, ok. Those two rights can be invoked at any time during this process. What you're doing by signing this waiver is you are waiving those rights, and you're agreeing to talk to us. But what you've got to remember is if we ask you a question you don't want to answer, you don't have to answer, ok. If we start getting in our discussion to where you are feeling uncomfortable, you can stop this interview at any time, ok. You can request an attorney at any time. Now once you request the attorney or tell us you don't want to answer a question, then we are done. You can invoke your rights at any time.

The following exchange then occurred:

Defendant: I mean, from what I understand, they're not going to give me an attorney until I go to court anyway.

Detective Sanders: That's true.

Defendant: I mean, it will be a public defender.

Detective Sanders: That's true.

Detective Burcham: Right. That doesn't mean one is going to appear here.

Defendant: Right here so that I can answer questions.

Detective Sanders: What this is, this is your waiver, okay? If you agree sign this --

Defendant then signed a waiver of his *Miranda* rights and stated, "I mean, I want to talk to y'all a little bit anyway. I've been wanting to." Detective Sanders again explained to Defendant that he could invoke his rights at any time during the interview.

Both the United States and Tennessee Constitutions recognize a privilege against compelled self-incrimination. *See* U.S. Const. amend. V (protecting a person from being "compelled in any criminal case to be a witness against himself"); Tenn. Const. art. I, § 9 (guaranteeing that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself"). In *Miranda v. Arizona*, the United States Supreme Court

15

established procedural safeguards to secure the Fifth Amendment privilege against self-incrimination. 384 U.S. 436, 444, 86 S. Ct. 1602 (1966). Pursuant to *Miranda*, law enforcement officers are required to warn a person prior to custodial interrogation that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. *Id.* at 479. An interrogation must cease if the suspect invokes his right to remain silent at any time. *Id.* at 473-74. If a suspect indicates that he wants an attorney, the interrogation must cease until an attorney is present. *Id.*

A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). The State bears the burden of proving by a preponderance of the evidence that the defendant waived his *Miranda* rights. *State v. Climer*, 400 S.W.3d 537, 564 (Tenn. 2013); *see also Missouri v. Seibert*, 542 U.S. 600, 608 n. 1, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). The State satisfies this burden if, based on the totality of the circumstances surrounding the interrogation, it shows that the waiver was voluntary in that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was knowing in that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986); *North Carolina v. Butler*, 441 U.S. 369, 374-75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Colorado v. Spring*, 479 U.S. 564, 573, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987); *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010); *Climer*, 400 S.W.3d at 564-65.

When a suspect makes an unequivocal request for an attorney, all interrogation must cease unless the suspect initiates further conversation with the police. *Edwards*, 451 U.S. at 484-485. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," questioning need not cease nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Turner*, 305 S.W.3d at 517.

Defendant asserts that he made an unequivocal request for an attorney. We disagree. Defendant stated, "I am going to have to get an attorney, but I mean, I was going to talk to you all without one for a little bit here." Defendant expressed his intent to obtain counsel in the future, not to have one present during his interview with detectives. Immediately following his mentioning counsel, Defendant indicated that he wished to speak to detectives. We agree with the trial court that Detectives Sanders and Burcham gave "bad advice" to Defendant. In fact, it was totally erroneous. In ruling on Defendant's motion to suppress, the trial court noted that the detectives erroneously

16

affirmed Defendant's misunderstanding that he would not be appointed an attorney until he went to court. Detective Sanders and Detective Burcham stated, "that's true" to Defendant's statement that he would not be appointed an attorney until he went to court; they also told Defendant that an attorney was not "going to appear here [at the interview]." These statements by the detectives were misleading and false. If the detectives had not further clarified Defendant's rights, and if Defendant had not expressed his desire to speak to the detectives, this court would conclude without hesitation that the trial court erred in denying the motion to suppress. However, following those exchanges, Detective Sanders reiterated to Defendant that he could invoke his rights at any time during the interview and Defendant again expressed his desire to speak to detectives and tell his story.

The interview lasted a little more than three hours. Defendant was very talkative and gave lengthy and detailed explanations to detectives about several issues, including the history of his relationship with the victim, his financial situation, and his account of what happened on the night of the incident. The interview ended after Detective Sanders described to Defendant the severity of the victim's injuries. Defendant stated, "Nah, if y'all are gonna sit here and accuse me of this, I'm done talking." The interview was concluded immediately. After reviewing the entire statement, we conclude that Defendant did not make a clear and unequivocal request to have an attorney present for the interrogation prior to when the interrogation ceased.

Defendant also contends that his statement to detectives should have been suppressed because it was taken following his illegal detention or unnecessary delay. When a person is arrested without a warrant, the law requires the arresting authorities to take him or her before a magistrate to "seek a prompt judicial determination of probable cause." *Gerstein v. Pugh*, 420 U.S. 103, 125, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975); *State v. Huddleston*, 924 S.W.2d 666, 668 (Tenn. 1996); *see also* Tenn. R. Crim. P. 5(a)(1). A delay of less than 48 hours is presumptively reasonable. *State v. Bishop*, 431 S.W.3d 22, 36 (Tenn. 2014). A delay shorter than 48 hours may still be unreasonable and unconstitutional if it is "for the purpose of gathering additional evidence to justify the arrest" or if it is "motivated by ill will against the arrested individual . . . ." *Id.*

In *Huddleston*, our supreme court concluded that "the exclusionary rule should apply when a police officer fails to bring an arrested before a magistrate within the [48 hours] allowed by [*County of Riverside v.*] *McLaughlin* [500 U.S. 44, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991)]." *Huddleston*, 924 S.W.2d at 673. Any evidence obtained from an unlawful detention must be suppressed under the fruit of the poisonous tree doctrine. *Id.* at 674-75. When a suspect is arrested on probable cause, however, the ensuing detention is typically not illegal until it "ripens" into a *Gerstein* violation. *Id.* at 675. Thus, "if the [arrestee's] statement was given prior to the time the detention ripened into

17

a constitutional violation, it is not the product of the illegality and should not be suppressed." *Id.*

The Blount County SWAT team entered Defendant's apartment at 3:40 a.m. on September 11, 2009. Defendant was transported to Blount Memorial Hospital at 4:07 a.m. He was released from the hospital around 4:02 p.m. on September 11, 2009. Defendant was then transported to jail. Defendant was transported from the jail to the Alcoa Police Department for the interrogation at 7:31 p.m. on September 12, 2009. Defendant was transported back to the jail at 11:44 p.m. Defendant made his initial appearance before the magistrate at 3:15 a.m. on September 13, 2009.

Defendant was brought before a magistrate for a probable cause determination within 48 hours of his warrantless arrest. Therefore, the delay in bringing Defendant for a probable cause determination was presumptively reasonable. Nothing in the record shows that the delay was "'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Bishop*, 431 S.W.3d at 42 (quoting *McLaughlin*, 500 U.S. at 56). Furthermore, Defendant has failed to establish that the delay was "'for the purpose of gathering additional evidence to justify the arrest.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56). Although the record reflects that law enforcement continued its investigation after Defendant was taken to the police station, no evidence suggests that the investigation continued in an effort to establish probable cause to justify Defendant's warrantless arrest. The record reflects that sufficient probable cause existed to believe Defendant was involved in the murder at the time Defendant was taken into custody. Police found the victim dead in her apartment, and it appeared that a "struggle had taken place." It appeared that someone had exited through the bedroom window. Defendant was seen at the victim's apartment complex on the night of the murder, and his van was seen parked a short distance from the victim's apartment complex. The victim had obtained an order of protection against Defendant. Shortly after discovering the victim's body, police found Defendant at his apartment following a suicide attempt. Defendant had a photo of the victim and an apparent suicide note in his lap. This evidence was sufficient to establish probable cause for Defendant's arrest. At the time of Defendant's arrest, "'the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" *State v. Dotson*, 450 S.W.3d 1, 50 (Tenn. 2014) (quoting *State v. Echols*, 382 S.W.3d 266, 277-78 (Tenn. 2012). Accordingly, the trial court properly denied the motion to suppress on this basis, and we conclude that Defendant is not entitled to relief as to this issue.

18

*Order of protection*

Defendant challenges the admissibility of the order of protection. The State argues that the trial court properly acted within its discretion in allowing the evidence in order to show Defendant's intent and motive. Additionally, the State argues that admission of the order of protection established an essential element of aggravated assault.

Tennessee Rule of Evidence 404(b) provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Assuming a trial court substantially complies with the requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). If, however, a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision is not entitled to deference by the reviewing court. *Id.*

The trial court found that the order of protection was necessary to establish an essential element of the charge in the fourth count of the indictment. Defendant was charged with aggravated assault by violation of a court order. In order to prove that

19

count, the State had to show that Defendant had "been enjoined or restrained by an order . . . from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against [the victim]." T.C.A. § 39-13-103(c). Moreover, the trial court concluded that the allegations of threats and abuse in the petition for the order of protection were relevant to establish Defendant's criminal intent and to rebut his theory of self-defense.

It is well-established that a trial court may admit evidence of prior bad acts by a defendant against a victim to show intent and motive. Tennessee courts have accepted the use of evidence of a defendant's prior violent acts against a victim of a violent crime as a means of allowing the State the opportunity to establish intent. See *State v. Gilley*, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008). Such evidence is probative of the defendant's mens rea because it reveals a "settled purpose" to harm the victim. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *Id.*

We conclude that evidence of Defendant's prior bad acts towards the victim were highly relevant to show Defendant's motive and intent. Defendant asserts, however, that the evidence of prior bad acts introduced through the testimony of Dorothy McClure, a deputy court clerk, was not clear and convincing. We disagree. Ms. McClure described the victim's demeanor as "excited, nervous, [and] scared." Other witnesses testified regarding the victim's fear of Defendant, including a co-worker and her apartment complex manager. Defendant is not entitled to relief on this issue.

*Suppression of crime scene and autopsy photographs*

Defendant contends that certain photographs, as well as a video recording of the crime scene, should have been excluded from evidence because they were more prejudicial than probative.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the

face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The State asserts that Defendant has waived any challenge to three photo exhibits: (1) a photograph of the victim taken when she was alive (hereinafter "victim's living photo"); and (2) two photographs showing blood in the area from which the victim's body was removed (hereinafter "blood photos"). The State argues that Defendant did not object to the admissibility of the blood photos, and therefore waived review of the admissibility of those photos. The State is correct and Defendant has waived review concerning the blood photos. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

As to the victim's living photo, the State asserts that although Defendant objected at trial to its admissibility, he failed to include that issue in a motion for new trial, and thus also waived this issue on appeal. Defendant did not file a reply brief to the State's brief. Generally, a failure to include in a motion for new trial any issue challenging admissibility of evidence during a jury trial results in waiver of that issue on appeal. Tenn. R. App. P. 3(e). However, the issue was specifically included in Defendant's amended motion for new trial, and is therefore not waived. Accordingly, we will address the issue on the merits, separate from our review of Defendant's challenges to admissibility of other photos and a video.

Over the years, this Court has consistently cautioned the State against the introduction of photographs of deceased victims taken when they were alive because they

21

typically lack relevance to the issues on trial and because of their potential to unnecessarily arouse the sympathy of the jury. *See, e.g., Young*, 196 S.W.3d at 106 (finding error in the trial court's admission of childhood photographs of the victim and calling for trial courts to "understand the proof and theory of the case, and whether there is a real dispute about the issue the evidence is to prove" (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 403. [5] (5th ed.2005); *State v. Cole*, 155 S.W.3d 885, 911-12 (Tenn. 2005) (recognizing that although "[a] family photograph may be relevant to establish the victim's identity as the person killed," "a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence"); *State v. Nesbit*, 978 S.W.2d 872, 902 & n. 3 (Tenn. 1998) (finding no error in admission of photograph taken while victim was alive but recognizing that "where the victim's identity has already been proven, further proof may be cumulative and, therefore, inadmissible"); *State v. Dicks*, 615 S.W.2d 126, 128 (Tenn. 1981) ("[I]t would have been better had the 'before' picture of [the victim] been excluded since it added little or nothing to the sum total of knowledge of the jury.").

Here, the victim's photograph was probative of Defendant's guilt because it was found in Defendant's lap along with a suicide note, which strongly suggested his involvement in the victim's murder. The victim's photograph was evidence of Defendant's guilty knowledge as well as his identity as the perpetrator. We conclude that the probative value of the victim's photograph in this case was not substantially outweighed by its prejudicial effect. Accordingly, Defendant is not entitled to relief on this issue.

The State contends that the trial court correctly ruled that the remaining photos were more probative than prejudicial. Having reviewed the trial court's analysis regarding each individual photo, we conclude that the trial court did not abuse its discretion in admitting the photos into evidence. The photos at issue include a black and white photo of the victim as she was found in her apartment. The trial court found that the photo showed evidence of a struggle. The trial court admitted another photo of the victim's body as it was found in her apartment. The photo is a color photo, and it shows the location of the victim's body between the refrigerator and stove, and it shows blood flow from the victim's injuries. In its pretrial rulings, the trial court denied in part and granted in part Defendant's request that all photographs of the victim's body be submitted to the jury in black and white. The trial court concluded that certain photos should be presented in color because they more effectively demonstrated the victim's injuries and aided the jury in understanding the medical examiner's testimony.

The trial court allowed into evidence a video of the crime scene to show the size and layout of the victim's apartment. The trial court ordered that certain portions of the video be redacted, including focus on religious items inside the victim's apartment.

22

Specifically, the court ordered that a zoomed-in shot of a Bible be redacted, but with regard to a picture of the "Last Supper" that was found hanging askew in the victim's kitchen, the trial court found that it was relevant to show that a struggle had taken place.

Our review of the record shows that the trial court carefully considered the probative value and prejudicial effect of each crime scene photo and the crime scene video in its entirety. The trial court excluded some photos and ruled others admissible because it found that they were relevant to the issues on trial, notwithstanding their gruesome and horrifying character. The autopsy photos were relevant to show the variety and severity of the victim's injuries. They were not especially gruesome in character, and Dr. Mileusnic-Polchan testified that the photos would assist the jury in understanding the medical testimony. We conclude that Defendant is not entitled to relief on this issue.

*Warrantless search of Defendant's apartment*

Defendant contends that evidence taken as a result of the warrantless search of his apartment should have been suppressed. The State contends that exigent circumstances existed to justify the warrantless entry into Defendant's apartment when officers saw that Defendant was in need of medical attention.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. *State v. Turner*, 297 S.W.3d 155, 165 (Tenn. 2009). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

An exception to the warrant requirement exists for exigent circumstances. *State v. Reynolds*, 504 S.W.3d 283, 304 (Tenn. 2016) (citing *Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S. Ct. 2408, 57 L. Ed. 2d, 290 (1978)).

> Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant. Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. The exigency of the circumstances is evaluated based upon the totality of the

23

circumstances known to the governmental actor at the time of the [search]. Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them. The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant. The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone. Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm.

*State v. Meeks*, 262 S.W.3d 710, 723-24 (Tenn. 2008) (footnotes omitted).

At the May 6, 2012 suppression hearing, Deputy Aycocke testified that Defendant opened his apartment door without request. He testified that Defendant was sitting inside the doorway, and he was covered in blood. Defendant had a "serious wound on his left arm." A photo of Defendant inside his apartment was admitted as an exhibit and shows Defendant's condition when officers entered the apartment. The trial court accredited the testimony of Deputy Aycocke and found that Defendant's testimony that he did not invite or give permission to officers to enter his apartment was not credible. We conclude that the trial court was correct in ruling that Defendant's wounds from his attempted suicide was sufficient to create exigent circumstances justifying the officers' warrantless entry into Defendant's apartment for the limited purpose of securing the scene and rendering aid to Defendant. On appeal, Defendant does not specify what items of evidence he challenges. He merely asserts that evidence was collected from a "search that took place immediately following his detention." Therefore, the issue is waived. This court is unable to guess at what items of evidence introduced at trial that Defendant claims should have been suppressed. Officers found an apparent suicide note and photo of the victim in Defendant's lap when they entered the apartment. Those items were clearly in plain view when the officers entered to render aid to Defendant, and therefore, were within the scope of the exigent circumstances search. *See State v. Cothran*, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003). Defendant is not entitled to relief on this issue.

*Doctrine of inevitable discovery of evidence*

Defendant also contends that the trial court should have suppressed evidence discovered following a search of his apartment pursuant to an invalid search warrant. A search warrant was issued on September 13, 2009, for Defendant's apartment. The trial court found the warrant to be defective because the issuing judge did not date the warrant.

24

However, the trial court allowed evidence seized from Defendant's apartment, specifically Defendant's clothing with blood on it and the victim's purse, during the execution of the invalid warrant under the doctrine of inevitable discovery.

Under the inevitable discovery doctrine, evidence obtained in apparent violation of a defendant's constitutional rights is admissible if the evidence would have otherwise been discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); *State v. Ensley*, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n. 5, 104 S. Ct. 2501.

The trial court found that Teeann Guy, an employee at Defendant's apartment complex, would have lawfully discovered the bloody clothing and the victim's purse after Defendant's eviction. She testified that Defendant's rent payment was late at the time of his arrest. Defendant was evicted after his arrest, and Ms. Guy called the police on two occasions regarding items she found while cleaning the apartment. Defendant contends that the items Ms. Guy contacted the police about, a knife and paraphernalia, "are different in nature than a bag of clothes or a purse." We disagree. Ms. Guy testified that she would have called the police had she discovered anything with blood on it. The trial court accredited Ms. Guy's testimony and found that "the evidence that was seized at the apartment would have been discovered . . . ." Although there was no testimony that the purse had blood on it, the trial court found that Ms. Guy "would have cleaned the apartment and would have called the police with respect to anything that she found." The trial court emphasized that Ms. Guy had already contacted the police on two prior occasions about items found in Defendant's apartment. The trial court stated, "I don't think there's any question that she would have called the police and that they would have found these items pursuant to the very fact that she did call the police with respect to other items." We agree with the trial court's ruling. Defendant is not entitled to relief on this issue.

*Scope of expert testimony*

Defendant contends that the trial court erred by allowing Dr. Mileusnic-Polchan to testify outside her area of expertise about blood spatter near the victim's body. The State responds that Dr. Mileusnic-Polchan properly limited her testimony to subjects within her expertise.

25

Dr. Mileusnic-Polchan testified in a jury-out hearing, "as forensic pathologists, we are frequently asked to look at the blood spatter and essentially to tell or explain where this could be coming from." She testified that she was not an expert in blood spatter, but that her work was frequently "done in collaboration with the blood spatter experts . . . based on our autopsy findings" in order to determine the organ or vessel that was the source of the blood spatter. Dr. Mileusnic-Polchan testified that she would not testify at trial "about the specifics of the blood spatter." She testified that the victim had "several different injuries that could be the source of blood spatter."

At the conclusion of Dr. Mileusnic-Polchan's jury-out testimony, the trial court stated,

> [Dr. Mileusnic-Polchan] has very clearly distinguished between a blood spatter specialist and what that person does, which she does not feel qualified to do, and what she believes she is qualified to do in terms of where the blood is likely coming from and what the flow of blood, the pattern, the spatter evidences with respect to the gushing of the blood, which she feels that she is qualified to do. And she's indicated she's not going to give any opinions about angles or measurements, those kinds of things that it would take a blood spatter specialist to do. So, I'm satisfied on that account.

Dr. Mileusnic-Polchan testified at trial,

> I'm not a blood spatter specialist. I do not measure, describe blood spatter. But I am frequently approached not just by law enforcement but by even the blood spatter specialists themselves, asking me, so, how would that, what they describe and find at the scene correlate with the findings and anatomical injury in the body. And that's basically how we work together as a team and try to come to a conclusion of what has caused blood spatter and how the position of the body at the scene would have been or could have been based on what they see. Because they cannot really analyze the blood spatter in a vacuum. They need my help telling them anatomically what's injured and how would that have caused this particular blood spatter. But also, vice-versa, I'm going to actually defer to their expertise for more details into the angles and the velocities and, overall, the pattern of the blood at the scene.

She testified regarding a photograph of the deceased victim (Exhibit 18),

26

Knowing what was actually injured in the body and looking at this particular scene, I already know what it's coming from. That's something that the blood spatter specialist does not know until he consults my autopsy report or talks to me. So, I know it's coming from the branches of the carotid artery on the left side. I can then describe this as the spatter that is going to be from the spray or some sort of directional coming from the –

Defense counsel objected to this testimony on the basis that Dr. Mileusnic-Polchan was not qualified to testify about the angles and direction of blood spatter. Dr. Mileusnic-Polchan clarified,

Well, what I am referring to – and the main question here is if we are seeing the blood in this particular distribution and we know what's injured, how is the body positioned? And my only answer to you is going to be the body is here, the body never leaves this corner –

The admissibility of expert testimony is governed by Rule 702 of the Tennessee Rules of Evidence. "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Our supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

*State v. Scott*, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted).

Trial courts are vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007).

27

On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *Scott*, 275 S.W.3d at 404. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)). At trial, the burden rests on the party proffering the expert witness to establish that the evidence "rests upon 'good grounds.'" *Scott*, 275 S.W.3d at 404.

The State argues that Dr. Mileusnic-Polchan's testimony was within her field of expertise and that she "offered no calculations or specifics as to the direction of the blood spatter other than to say that it came from the victim in the area that her body was found." We agree with the State. Defendant is not entitled to relief on this issue.

*Jury instruction*

Defendant contends that the trial court erred in denying his request for a special jury instruction. Defendant asserts that he submitted a handwritten request for a special jury instruction that Detective Sanders "was not a medical expert and that his statements during his interrogation of [Defendant] were statements, and not facts." The State responds that the trial court's instructions to the jury were a complete and accurate statement of the law, and the requested instruction was unnecessary.

"[A] defendant has a right to a correct and complete charge of the law." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001). And the trial court has the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). When the defendant raises an issue about an omitted instruction, the court must review the entire jury charge to determine "if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992).

The proposed instruction is not part of the record. It is the defendant's duty "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues [that] form the basis of the appeal." Tenn. R. App. P. 24(b). However, in its order denying Defendant's motion for new trial, the trial court addressed the proposed instruction, and in his brief on appeal, Defendant agrees with the trial court's description. The proposed instruction was regarding Detective Sanders statement to Defendant during his interrogation "that he knew [Defendant] had done certain

acts . . . ." The trial court concluded that Detective Sanders "had simply engaged in an interrogation technique where law enforcement presents a defendant with certain evidence in hope of eliciting a confession." The trial court also "noted that it would charge the jury that it would be up to them to determine what the facts are and whether Defendant was guilty of anything." The proposed instruction also regarded another portion of the interview in which "Detective Sanders made reference to certain things that he had been told by the medical examiner, including . . . that the medical examiner had stated that the perpetrator of the crime had used a chisel rather than a knife." The trial court found that this statement by Detective Sanders was also an interrogation technique and declined to give the proposed instruction that Detective Sanders "was not a medical expert and that his statements during his interrogation of [Defendant] were statements, and not facts."

We agree with the State that the jury instructions given by the trial court in this case were accurate and complete. The trial court instructed the jury that "[y]ou alone are the exclusive judges of the facts of this case." The trial court accurately and completely instructed the jury about its consideration of expert testimony and listed TBI Agent Everett and Dr. Mileusnic-Polchan as the only two expert witnesses. We conclude that the trial court did not err by denying Defendant's request for a special instruction. Defendant is not entitled to relief on this issue.

*Authentication of video and photo evidence*

Defendant contends that the trial court erred by allowing into evidence a video of him at the victim's apartment complex and a photo of him in his apartment. Defendant asserts that the evidence was not properly authenticated.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Authentication may be established by the testimony of a witness with knowledge that a matter is what it is claimed to be. Tenn. R. Evid. 901(b)(1). "[Q]uestions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this court will not interfere in the absence of abuse appearing on the face of the record." *Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008).

Defendant challenges the admission of the apartment complex surveillance video that was introduced through the testimony of James Eisele, the maintenance worker, because Mr. Eisele testified that the time stamp shown on the video was not accurate. Defendant argues on appeal that because "the time stamp is not accurate, it cannot be determined what the video presents." Mr. Eisele testified that he reviewed the video from

the night of the incident on the following morning. He testified that the time stamp on the video had always been "off an hour and four minutes." He testified that he did not know "how to switch it over." Mr. Eisele also saw Defendant at the apartment complex on the night of the incident, and he confirmed that the video was a true and accurate depiction of what happened. We reject Defendant's argument that the video was improperly authenticated.

Defendant also challenges the admission of a photo taken of Defendant in his apartment. He asserts nothing more than, "it was not a properly authenticated picture of how the witness found [Defendant]." Agent Rusty Aycocke reviewed the photo and confirmed that it was a true and accurate depiction of what he saw when the door to Defendant's apartment opened. He testified that when the door first opened, Defendant's posture was slightly more upright, but that "besides his posture changing slightly, [the photo was] certainly true and accurate of what [Agent Aycocke] saw when the door opened." We also reject Defendant's argument that the photo was improperly authenticated. Defendant is not entitled to relief on this issue.

*Incomplete transcript*

Defendant contends that the trial court should have granted his motion for new trial based upon a portion of Detective Sanders' trial testimony having not been transcribed. The State responds that Defendant has waived this issue by submitting a statement of the evidence in substitution for the missing transcript and that Defendant is not entitled to relief because he has not identified any inaccuracy in the statement of the evidence or any issue on appeal that relates to the portion of the transcript that is missing.

Tennessee Code Annotated section 40-14-307(a) provides that in all felony cases in the trial courts of Tennessee:

> A designated reporter shall attend every stage of each criminal case before the court and shall record verbatim, by a method prescribed or approved by the administrative director, all proceedings had in open court and other proceedings as the judge may direct. The reporter shall attach the reporter's official certificate to the records so taken and promptly file them with the clerk of the court, who shall preserve them as a part of the records of the trial.

T.C.A. § 40-14-307(a).

Accordingly, a criminal defendant has a statutory right to have a verbatim recording and transcript of all proceedings of his or her trial and sentencing hearing.

30

Rule 24(c) of the Tennessee Rules of Appellate Procedure provides for situations in which no transcription of the evidence or the proceedings is available:

> If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal.

Tenn. R. App. P. 24(c).

The trial court addressed the unavailable portions of transcript in its order denying Defendant's motion for new trial and noted that the missing portion was approximately 15 minutes in duration. Based upon the court reporter's stenographic notes and the trial court's notes, the trial court gave a detailed summary of the unrecorded testimony of Detective Sanders on cross-examination.

The notice of appeal in this case was filed on June 8, 2015. In an order dated August 28, 2015, this court granted Defendant additional time in which to file a statement of the evidence. Defendant filed a statement of the evidence pursuant to Rule 24, in which Defendant corrected the following errors or omissions in the trial court's recollection of the lost testimony and gave Defendant's best recollection of Detective Sanders' testimony:

> 5.    That the Defendant mostly accepts the recollections of the Trial Court, so far as they relate to the issues of the trial proceedings during the missing section of the transcripts except for the following objections and additions.
>
> a.    That the Court noted in Subsection "C" on page 49 of its Order Denying Motion for New Trial that the photograph marked as exhibit 74 was of "injuries to Defendant received as a result of his suicide attempt." Exhibit 74 was not introduced for any reason related to a suicide attempt. The Defendant would propose instead that Exhibit 74 was introduced showing injuries to Mr. Long's arm. This is supported by the partially transcribed testimony of the Court Reporter.

31

b.    That Defendant's counsel asked Detective Sanders whether the Defendant had made a statement that [the victim] had threatened the Defendant with a knife on the night of the incident. Detective Sanders agreed that he had.

c.    That Defendant's Counsel asked whether [ ] Detective Sanders looked for the knife outside of the apartment and Detective Sanders said that he did.

d.    That Defendant's Counsel asked Detective Sanders if he used a metal detector to search for the knife. Detective Sanders said he did not. Detective Sanders was asked if he was aware of anyone from law enforcement searching for the knife with a metal detector and he did not know of anyone.

By submitting his own statement of the evidence, Defendant has waived any claim about the adequacy of the appellate record. There was no objection to Defendant's statement of the evidence; therefore, it is deemed to have been approved. See Tenn. R. App. P. 24(f). Furthermore, Defendant has not stated how he was prejudiced by the unavailable transcript. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

First-degree murder is defined as the intentional and premeditated killing of another. T.C.A. § 39-13-202(a)(1). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). Premeditation is defined as "an act done after the exercise of reflection and judgment" and committed after the accused "was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d). The existence of premeditation is a question of fact for the jury to determine based on a consideration of all of the evidence. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from the circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998); *State v. Addison*, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997).

Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

As relevant in this case, felony murder is defined as a killing of another committed in the perpetration or attempt to perpetrate a burglary. T.C.A. § 39-13-202(a)(2). For a felony murder conviction, no culpable mental state is required except the intent to commit the underlying felony offense. T.C.A. § 39-13-202(b).

Aggravated burglary is defined as entry into a habitation without the effective consent of the property owner with intent to commit a felony, theft or assault. T.C.A. § 39-14-402(a)(1), -403(a).

The evidence adduced at trial showed that the police found the victim's body on the kitchen floor of her apartment. She was on her back, wedged between the stove and refrigerator. She had several patterned injuries on her head that were consistent with blows from a hammer that was found near her body and that tested positive for her blood. She also had several sharp force injuries on her neck, which were consistent with the claw end of the hammer. Some of the victim's injuries were consistent with a chisel that police found outside her bedroom window that tested positive for her blood.

33

Two witnesses testified about the victim's fear of Defendant. The victim obtained an order of protection against Defendant during the month preceding her murder. On the night of the murder, a maintenance worker saw Defendant and his van near the victim's apartment complex. A video surveillance recording at the victim's apartment complex showed Defendant on the premises that night. When police arrived at Defendant's apartment, he had attempted suicide. A suicide note and photo of the victim were found in Defendant's lap. Inside Defendant's apartment, police also found clothing with the victim's blood on them and the victim's purse containing her belongings.

Defendant gave a detailed statement to the police. Defendant told police that he was "pissed off" that the victim had been granted an order of protection against him, and he told police that he went to the victim's apartment, in violation of the order of protection, because he believed that another man was living with her. Defendant parked at another location a short distance from the entrance to the victim's apartment complex. He entered the victim's apartment without consent. When the victim arrived home, Defendant hit her several times in the head with a hammer. Defendant admitted that he stabbed the victim in the neck when she tried to yell. Defendant then took the victim's purse and fled through her bedroom window.

Defendant argues that he "was attacked by the [victim]" and that in his statement to police, "he consistently denied premeditation." The brutality and cruelty of the victim's murder was shown by the evidence of her injuries. Defendant offered no aid to the victim, who bled to death on her kitchen floor. Instead, Defendant took the victim's purse and left the scene.

We conclude that the evidence is sufficient to establish premeditation. The evidence is also sufficient to establish that Defendant entered the victim's apartment without her consent and with the intent to assault her, and that Defendant killed the victim during the commission of an aggravated burglary. Defendant is not entitled to relief on this issue.

*Closing argument*

Defendant contends that the State exceeded the scope of closing argument in its rebuttal argument and argued evidence that was not presented at trial when the prosecutor attributed Defendant's injuries to his climbing out of the victim's bedroom window.

Tennessee Rule of Criminal Procedure 29.1(c)(2) states that "[t]he state's final closing argument is limited to the subject matter covered in the state's first closing

34

argument and the defendant's intervening argument." The State contends that Defendant has waived this issue because he failed to object contemporaneously to the State's rebuttal closing argument. The record reflects that the Defendant did not object during closing argument. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We conclude that the issue is waived for failure to object contemporaneously, and we decline to review the issue for plain error. Defendant is not entitled to relief on this basis.

*Cumulative error*

Finally, Defendant asserts that the trial court's cumulative errors warrant the reversal of his convictions. *See State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010) ("The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial."). Having found no error in the trial proceedings, we need not consider the cumulative effect of the alleged errors.

CONCLUSION

Based upon the foregoing, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

35